Filed 6/9/25

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GREGORY WILSON,<br><br>    Defendant and Appellant. | 2d Crim. No. B323666<br>(Super. Ct. No. NA109563)<br>(Los Angeles County) |

Sex trafficking has its own terminology that is unfamiliar to persons who are not engaged in the commercial sex business. For example, few people outside of this business have heard the term "gorilla pimp," which is at issue here. Until this case, the author of this opinion had never heard anyone use the term.[1]

In a sex trafficking case, is defense counsel ineffective, as a matter of law, if counsel does not object to the prosecutor's referral to the black defendant as a "gorilla pimp" during closing argument to the jury? Appellant contends his counsel was ineffective for "failing" to object because the prosecutor's

---

[1] There are other unfamiliar terms in the sex trafficking lexicon, e.g., "Romeo Pimp" (*post,* at pp. 14-16); "Track" (*post*, at p. 6); "Blade" (*post*, at p. 8); "Game" (*post*, *at* p. 14); and "Finesse Pimp" (*post*, at p. 15).

comments violated the Racial Justice Act (RJA, Pen. Code, § 745).[2]

Based upon the present record, we conclude that defense counsel was not ineffective as a matter of law. His claim of ineffective counsel should be resolved in a habeas corpus proceeding instead of on appeal. In a habeas corpus proceeding defense counsel will have "the opportunity to explain the reasons for . . . her conduct. 'Having afforded the trial attorney an opportunity to explain, courts [will be] in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence.'" (*People v. Wilson* (1992) 3 Cal.4th 926, 936.)

Gregory Wilson appeals from the judgment entered after a jury found him guilty of two counts of human trafficking a minor by force or fear (§ 236.1 subd. (c)(2) – counts 1 and 2); one count of human trafficking to commit another crime (§ 236.1, subd. (b) – count 3); two counts of kidnapping (§ 207, subds. (a), (e) – counts 5 and 8); and one count of criminal threats (§ 422, subd. (a) – count 4). As to count 3, the jury found true an allegation that he had personally inflicted great bodily injury. (§ 236.4, subd. (b).) It found him not guilty of rape (§ 261, subd. (a)(2)) and forcible oral copulation (§ 288a, subd. (c)(2)(C)). The trial court sentenced appellant to prison for an aggregate determinate term of 31 years, eight months, to be followed by an indeterminate term of 30 years to life.

For the first time, appellant now contends the prosecutor violated the RJA by referring to him as a "gorilla pimp" during closing argument. In common usage, a gorilla is a large anthropoid ape. The word also means a "brutish or thug-like man." (American Heritage Dict. (2d college ed. 1985) p. 568.)

---

[2] Undesignated statutory references are to the Penal Code.

"Gorilla pimp" is a term of art used in the sex worker subculture to describe a pimp who uses force and violence to recruit or control his prostitutes. At no time did the prosecutor compare appellant to an actual gorilla.

Appellant asserts that defense counsel's "failure" to object to the perceived RJA violation deprived him of his constitutional right to effective assistance of counsel.[3] The People do not concede that the prosecutor violated the RJA. But they do concede that counsel was ineffective for "failing" to object and that the judgment should be conditionally reversed.

Because counsel did not object, appellant forfeited the claim that the prosecutor had violated the RJA. Appellant is therefore limited to his claim that counsel was ineffective. As previously noted, we conclude that counsel was not ineffective as a matter of law.

Appellant challenges the sufficiency of the evidence supporting his convictions for human trafficking and kidnapping. We conclude substantial evidence supports the convictions.

Finally, we reject appellant's claims that the trial court (1) abused its discretion in sentencing appellant, and (2) violated section 654's prohibition against multiple punishment by imposing prison terms for both kidnapping and trafficking victims K.W. and B.C. Accordingly, we affirm.

*Factual Background*

<u>B.W.</u>

Appellant met B.W. when he was about 15 years old. She was four years older and lived across the street from him in

---

[3] We have previously considered the use of the word "failure" in this context. Certainly, there are instances where defense counsel "fails," i.e., "neglects," to object. But there are also instances where defense counsel reasonably "elects" not to object. (See *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 221.)

Hemet. The two began a long-term romantic relationship. After appellant became an adult, they relocated to Long Beach. B.W. began earning money as a sex worker, and appellant acted as her pimp. He required her to pay him all the money she earned. He forbade her from talking to black men because they might be rival pimps trying to recruit her.

B.W. started working for appellant because she "loved him." Appellant told her that, if she did not follow his "rules," she would get "beaten" up by him.

One time B.W. tried to hide in her wig the money that she had earned. Appellant hit her in the lip with his fist, "snatched [her] hair off," and recovered the money. B.W. never again tried to hide money from appellant.

Every day except Thursday, appellant required B.W. to work as a prostitute from 8:00 p.m. until 4:00 a.m. He also required her to keep in communication with him during her work hours.

Sometimes appellant required B.W. to earn at least $1,000 in a single day's work. If she failed to earn this amount, he beat her. This happened on more than 10 occasions. Appellant choked B.W. with his hands around her neck until she felt that she "was going to pass out."

Several times B.W. ran away because she was "tired" of appellant's "physical abuse." But each time she returned to him because she "needed somebody . . . just to watch my back[] for protection." B.W. was "familiar with the dangers associated with commercial sex work."

Over time, appellant's beatings of B.W. became more frequent. He eventually beat her "almost every day." B.W. did not call the police because she "was getting held hostage." She explained, "[H]e would take my phone. I can't call nobody." She also was concerned about what appellant would do to her if she

4

complained to the police. B.W. testified that appellant "would probably kill [her]" if he "found out that [she had] snitched on him."

One time appellant hit B.W. in the lip with a "hard brush." Her lip was "busted open" and bled "a lot." B.W. went to the hospital, where doctors used "staples and stitches" to repair her lip. The injury left a scar.

On another occasion appellant inflicted a disfiguring injury to the ring finger of B.W.'s left hand. The finger "felt broke." Appellant drove her to a medical center to receive treatment. B.W. did not tell the treating physicians that appellant had harmed her because she "was afraid . . . that [appellant] might hurt [her]." For several weeks, the finger was in a splint to keep it immobile so it could heal.

### K.W.

K.W. was a 14-year-old "runaway." She called an acquaintance to pick her up at a motel in Compton. She was picked up by a car in which appellant was a passenger. A woman named "Trish" was in the back seat. The car drove to a restaurant in the San Fernando Valley, where they had something to eat.

K.W. was supposed to be driven to her home. Instead, while K.W. was asleep, she was driven to "the Harbor Track" in Orange County. A "'track' is where sex workers go to catch dates."

Appellant said to K.W., "'Get out of my car, Bitch.'" Appellant and Trish "dragged [K.W.] out [of] the car." K.W. was "scared." Trish told K.W. that she was supposed to perform sex acts in exchange for money and give all of the money to appellant. This was K.W.'s "first . . . foray in the commercial sex industry."

K.W. performed sex acts as instructed.  She gave appellant the money that she had earned.  Appellant took her to a motel room in Long Beach.

The next day, appellant took K.W. to Long Beach Boulevard, where she again performed sex acts for customers.  K.W. gave appellant the money that she had earned.  Appellant told K.W. not to "talk to black guys" because "they could be pimps."

K.W. felt "uncomfortable" in appellant's presence.  While she was taking a shower, he "busted" into the bathroom and "tried to grab" her.

Because of appellant's "aggression and his authority," K.W. did not believe she was free to leave.  Appellant was "just mean." His "demeanor" and size scared her.  He was "way bigger" and "way older" than her.  K.W. testified, "I'm little, okay?  It's fair and square, I'm little."  K.W. was also scared of Trish because she "was working right with [appellant]."

On the third day, K.W. decided to escape from appellant. She texted a black man she knew and asked him to pick her up. Trish saw that K.W. "was texting a guy."  Trish informed appellant.  K.W. testified: "I was standing outside.  [Appellant] told me to come inside, and he was, like, 'What did I tell you about talking to black guys?' And I told him, 'You told me not to.' And he socked me in my mouth, busted my lip, and told me go stand in the corner."  Her lip was bleeding.

K.W. ran down the stairs of the motel where she was staying.  She fell and cut her knee.  She ran into the motel manager's office and asked him to call a taxi for her.  Trish chased her down the stairs and banged on the windows of the manager's office.  The manager helped K.W. leave the motel.

6

B.C. started working in the commercial sex industry when she was 15 years old. She stopped working when she was 17 years old.

B.W. met B.C. while they were working in Los Angeles as "renegades," or sex workers without a pimp. B.W. had temporarily left appellant. After B.W. returned to appellant, B.C. also started working for him. Appellant "acknowledges [B.C.] was under the age of 18."

B.C. told the police that appellant had been her pimp for approximately three months. But B.W. testified that she and B.C. had worked together for appellant for about one month. Each night B.C. earned about $700 and gave all of the money to appellant.

B.W. saw appellant slap B.C. inside a motel room. According to B.W., B.C. ran out of the room and was crying. Appellant ran after her, "chased her with a car" "down to the blade," and brought her back to the motel room. During opening statement, the prosecutor explained that in the commercial sex industry the term "blade" "refer[s] to the street or the . . . area where sex workers commonly work and where traffickers of sex workers transport or deliver their girls to work." When B.C. returned to the motel room, she was still crying. Thereafter, B.C. continued working for appellant as a prostitute.

B.C. testified about this incident. She said she had fled because she was "afraid" of appellant and did not "want to be beaten anymore by" him. "So [she] tried to escape by running away, and [she] got chased down the street until [she] got caught." "[A]fter [she] got caught, [appellant] put [B.C.] back out and forced [her] to work as a sex worker."

7

Appellant required B.C. to give him all of the money she had earned as a sex worker.  More than once appellant beat her because she had spent some of the money on food to feed herself.

B.W. testified that she had seen appellant slap B.C. on another occasion because "[s]he didn't make enough money." B.C. "was crying."  This incident occurred before the incident in the motel room when appellant slapped B.C. and she tried to run away.  B.C. said appellant would beat her if she failed to meet her daily dollar quota.

*Appellant's Theory of the Case*

In her opening statement defense counsel said: "During this trial, you will hear evidence of pimping.  It is undeniable that [appellant] pimped [K.W.] and [B.W.].  He took money that they had earned from sex.  It's as simple as that.  But you will not hear evidence – there is no evidence – that he trafficked, kidnapped, or sexually assaulted anyone."

*Prosecutor's Alleged Misconduct and Violation of the RJA*

Appellant contends: "The prosecutor committed pervasive, prejudicial misconduct by appealing to the jurors' emotions, racial bias, and denigrating the defense in violation of appellant's rights to due process and a fair trial."  "The prosecutor used inflammatory rhetoric to . . . distract and shift the jury's focus away from the actual evidence presented at trial . . . ." For example, the prosecutor accused appellant of "'sexually enslaving'" the victims.  Appellant asserts that the prosecutor's "numerous irrelevant and gratuitous references to slavery throughout her closing argument . . . improperly appealed to the jurors' emotions by stressing the need for them to protect children and punish those who sexually enslaved them."

Appellant expresses particular concern about the prosecutor's referral to him as a "gorilla pimp" during closing argument.  Appellant states, "Most strikingly and

8

inappropriately the prosecutor argued: 'The fact that she [(14-year-old K.W.)] is staring at a 5'11", 200 some odd pounds gorilla pimp in the face, she is in a strange environment, she doesn't know how to get herself out of it, that is enough to make any child fearful." The prosecutor referred to appellant as a "gorilla pimp" on two other occasions during closing argument, including the following comment: "They [the defense] want to have you look down your noses and demonize and vilify these victims who are, no fault of their own, being trafficked by a gorilla pimp."

Appellant asserts: "The term 'gorilla' is a racially laden term that was gratuitously thrown into the prosecutor's improper and highly inflammatory closing argument. [¶] The term 'gorilla pimp' uses animal imagery. Even when not intended as a coded racial appeal, the word 'gorilla' suggests racial overtones when used in a trial involving a Black defendant." "[T]he prosecutor repeatedly referenced slavery adding to the racial undertones of the case where all the alleged victims were Black." "[T]he prosecutor's gratuitous use of racially discriminatory language [violated] the RJA." The RJA is violated when, "[d]uring the defendant's trial . . . an attorney in the case . . . use[s] racially discriminatory language about the defendant's race, . . . whether or not purposeful." (§ 745, subd. (a)(2).)

Appellant forfeited the claim of prosecutorial misconduct because he did not object to the alleged misconduct. "'"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. . . ."'" (*People v. Thomas* (2011) 51 Cal.4th 449, 491.)

By not objecting, appellant also forfeited his claim that the prosecutor had violated the RJA. (*People v. Singh* (2024) 103

9

Cal.App.5th 76, 114 ["where, as here, defendant could have but failed to raise his Racial Justice Act claim below, it is forfeited"].)

Appellant claims that, because of counsel's "failure" to object to the prosecutor's use of the term "gorilla pimp," he was denied his constitutional right to effective assistance of counsel: "There can be no satisfactory explanation for counsel's failure to object to the prosecutor's improper inflammatory and racially discriminatory rhetoric calling appellant a 'gorilla pimp' and appealing to the passion and prejudice of the jury. There was no conceivable upside to allowing the prosecutor to disparage the defense, inappropriately appeal to the jurors' emotions, and use racially discriminatory language to describe appellant. As such, counsel had no reasonable tactical basis for failing to object, and her failure to do so fell below an objective standard of reasonableness."

The People acknowledge that "the term 'gorilla pimp' was just one of many slang terms used in the sex trade." Nevertheless, the People "agree[] that . . . defense counsel . . . was constitutionally ineffective for failing to allege a violation of the RJA below in response to the prosecutor's use of the term 'gorilla pimp' in making a physical description of appellant during closing argument." The People are referring to the prosecutor's statement that K.W. was "staring at a 5'11", 200 some odd pounds gorilla pimp in the face." The People explain: "The prosecutor's phrasing described appellant's physical characteristics in a manner that could be construed as referring to him as a gorilla. Doing so was improper." "[T]he physical comparison of appellant to a gorilla . . . went beyond the appropriate use of that term to describe pimping *tactics*," i.e., controlling prostitutes through force and violence. "Use of this term ['gorilla pimp'] as part of a physical description of the defendant falls within the category of animal imagery that the

10

Legislature has expressly forbidden as 'racially discriminatory language' in the RJA.  (. . . §745, subd. (h)(4).)"

Section 745, subdivision (h)(4) provides: "'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, *language that compares the defendant to an animal, or language that references the defendant's physical appearance*, culture, ethnicity, or national origin.  Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (Italics added.)

The People contend that, if defense counsel had objected to the prosecutor's description of appellant as a "gorilla pimp," appellant "could have established a prima facie case for an RJA violation based on the physical comparison of him using animal imagery."  "But . . . such a finding standing alone would have only entitled appellant to a full hearing on this question under section 745, subdivision (c)."  Subdivision (c) provides, "If a motion [pursuant to the RJA] is filed in the trial court and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing."  The People claim that "the appropriate remedy is to conditionally reverse the judgment and remand the matter to the trial court for further proceedings pursuant to section 745, subdivision (c)."  (See *Lafler v. Cooper* (2012) 566 U.S. 156, 170 ["a remedy [for ineffective assistance of counsel] must 'neutralize the taint' of a constitutional violation, [citation], while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources the State properly invested in the criminal prosecution"].)

11

"To prevail on an ineffective assistance of counsel claim, appellant must satisfy the test established in *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674]. 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant [under] the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citations.] To satisfy the first part of the test, appellant must demonstrate that 'counsel's representation fell below an objective standard of reasonableness.'" (*People v. Simmons* (2023) 96 Cal.App.5th 323, 336.)

Our Supreme Court has "repeatedly stressed 'that "[where, as here,] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or *unless there simply could be no satisfactory explanation*," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267, italics added; see also *People v. Romero and Self* (2015) 62 Cal.4th 1, 25.)

Appellant has not shown that there could be no satisfactory explanation for counsel's failure to object. Counsel could have reasonably believed that the jury understood the prosecutor was not using the term "gorilla pimp" to physically describe appellant or compare him to a gorilla. The prosecutor was using the term to describe the technique used by appellant to recruit and control the prostitutes who worked for him.

During her opening statement, the prosecutor said the jury would learn about the different techniques used by pimps. One technique, she explained, "[is] commonly referred to as the 'gorilla pimp.' . . . [A] gorilla pimp commonly uses threats, violence, physical force to get his sex workers to comply with his rules." An expert testified: "There is the Romeo pimp which is a very smooth-talking individual that uses . . . flattery and . . . nice words to recruit young girls into commercial sex. [¶] The opposite of him is the gorilla pimp who uses very aggressive tactics. The gorilla pimp can even snatch a girl off the street just because she made eye contact with him. [¶] In the middle of that is what we call a hybrid pimp who uses Romeo tactics to recruit but Gorilla methods whenever there is a rule violation."

The prosecutor asked victim B.C., "When I say those words 'gorilla' and 'Romeo,' you know what those mean; correct?" B.C. responded, "Yes." The prosecutor continued, "They are actually called gorilla and Romeo pimps in the Game?" B.C. replied, "Gorilla, mostly Romeo." During her opening statement, the prosecutor explained to the jury that "the Game" is street slang for "the commercial sex arena, . . . an underworld where traffickers and sex workers communicate and ply their trade." B.C. testified that a "gorilla pimp" is "aggressive." She said that in the past she had been recruited by a "Romeo pimp" who had "turn[ed] into a gorilla pimp." She knew "about girls getting beat down by gorilla pimps out there."

"Gorilla pimp" has been used in many cases to describe a physically abusive pimp. Appellant recognizes that "the term 'gorilla pimp' appears not infrequently in cases involving pimping, pandering, and sex trafficking—both in the context of expert testimony and as used by those involved in the trafficking [citations] . . . ." (See, e.g., *People v. Moses* (2020) 10 Cal.5th 893, 896 [pimp wrote to undercover officer posing as a prostitute, "'I'm

13

not a gorilla [a pimp who is violent toward his prostitutes], nor am I what they call a pimp nowadays. I'm a true gentlemen [*sic*] . . .'" (brackets in original)]; *People v. Zambia* (2011) 51 Cal.4th 965, 971 [undercover officer "characterized [the defendant] as acting like a 'gorilla pimp,' or one who uses 'verbal threats and violence to get their way and to scare prostitutes into working for them'"]; *People v. Leonard* (2014) 228 Cal.App.4th 465, 492 [expert "testified at trial regarding the ways pimps control the prostitutes who work for them. Some pimps are 'finesse pimps,' who use promises of money, jewelry, travel, and love as tools of control. Other pimps are 'gorilla pimps' who rely on violence and threats"]; *United States v. O'Neal* (5th Cir. 2018) 742 Fed.Appx. 836, 838 [pimp said a prostitute "gave him money even though he did not provide her protection or set up her advertisements because his 'game [was] strong,' and he was a 'finesse pimp' rather than a 'gorilla pimp'; that is, he did not use physical coercion"]; *State v. Hogan* (Wis. Ct. App. 2021) 397 Wis.2d 171, 180, 959 N.W.2d 658 [expert "identified two main types of pimps: the 'finesse' or 'Romeo' pimp that acts in a more superficially loving manner and 'the gorilla pimp' that operates mainly through force and brutality"]; *State v. Lampley* (La. Ct. App. 2018) 265 So.3d 799, 809 [prostitute testified that "[t]his particular pimp, whom she considered a 'gorilla pimp' (a term used for an excessively physically abusive pimp), began beating her"].)

Thus, defense counsel could have reasonably concluded that the prosecutor had not "used racially discriminatory language about the defendant's race" or "racially charged or racially coded language." (§ 745, subds. (a)(2), (h)(4)). Instead, she had used racially-neutral, sex-trafficking street slang to describe the defendant's conduct. The same term could have been used to describe the conduct of a violent white, Hispanic, or

14

Asian pimp. "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.)

In addition, counsel could have reasonably believed that the prosecutor's use of the term "gorilla pimp" fell within the following exception to the RJA: "This paragraph does not apply if the person speaking is relating language used by another that is relevant to the case . . . ." (§ 745, subd. (a)(2).) "Gorilla pimp" was used by other witnesses in the case. The language was relevant because it educated the jury as to the different techniques used by pimps to recruit and control prostitutes.

The language's relevance is supported by *Poole v. State* (Fla. Ct. App. 2019) 284 So.3d 604. There, the defendant was convicted of "human trafficking for commercial sexual activity . . . ." (*Id*. at p. 605.) An expert witness testified about the commercial sex industry and human trafficking. He "defin[ed] terms used in trafficking such as . . . Romeo pimps, and gorilla pimps." (*Id*. at pp. 605-606.) The appellate court rejected the defendant's claim that the trial court had abused its discretion in admitting the expert's testimony: "We . . . hold that expert opinion on human trafficking and the sex worker subculture can assist the trier of fact on subjects not within an ordinary juror's understanding or experience. [Citations.] Not only are jurors generally unfamiliar with the realities of human trafficking, [citation], but a juror's only exposure to this subject may be confined to brief references gleaned from popular media outlets or fictionalized accounts. [Citation.] This only underscores the importance of expert testimony to aid the juror in understanding the complexities surrounding human trafficking and the sex worker subculture in today's society." (*Id*. at p. 607) "Based

15

on . . . [the] expert testimony, the jury . . . could better understand critical issues in the case that might have confused jurors unfamiliar with the patterns and penchants of sex workers." (*Id*. at p. 608.)

Even if, as the People argue, appellant could have made the requisite "prima facie showing of a violation of subdivision (a)" to warrant a hearing (§ 745, subd., (c)), at the hearing he would have had "the burden of proving a violation of subdivision (a) by a preponderance of the evidence." (*Id*., subd. (c)(2).) Counsel could have reasonably believed that appellant would not be able to carry this burden of proof. There is a significant gap between a "prima facie showing" and "proof by a preponderance of the evidence." "'Prima facie showing' means that the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred. . . . [A] 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not." (*Id*., subd. (h)(2).) "The defining feature of the prima facie standard is that it creates an initial burden on a moving party to proffer evidence that would support a favorable ruling without a court's consideration of conflicting evidence put forth by the opponent." (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 21.)

Moreover, defense counsel may have had legitimate tactical reasons for not objecting. "[C]ompetent counsel may often choose to forgo even a valid objection. '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.'" (*People v. Riel* (2000) 22 Cal.4th 1153, 1197 (*Riel*); see also *People v. Seumanu* (2015) 61 Cal.4th 1293, 1312 ["a case in which the mere failure to object would rise to such a level as to implicate one's state and federal constitutional

16

right to the effective assistance of counsel would be an unusual one"].)

"Effective attorneys do not always make an objection merely because it might be successful . . . ." (*Riel, supra,* 22 Cal.4th at p. 1197.)  For example, defense counsel could have decided not to object to avoid emphasizing the evidence that appellant fit the behavior pattern of a "gorilla pimp."  (See *People v. Harris* (2008) 43 Cal.4th 1269, 1290 ["while requesting an admonition was one tactical option, counsel could also have decided that objecting would focus the jury's attention on the threat incident in ways that would not be helpful to the defense"].)

Appellant notes: "[I]n a recent decision by the Court of Appeals of Washington, the court reversed a conviction based on the prosecutor's introduction of the concept of a 'gorilla pimp.' (*State v. McKenzie* (Wash. Ct. App. 2022) 21 Wash.App.2d 722, 723[, 508 P.3d 205 (*McKenzie*)].)  The court explained that in the context of that case, in which a Black man was accused of targeting a White girl for sexual exploitation and in which '[n]o witness had used this terminology and the issue of pimping had minimal relevance,' the 'only purpose served by referencing the gorilla pimp concept was to tap into deep-seated racial prejudice by comparing Black human beings to primates.'"

*McKenzie* is distinguishable.  Here, all the victims were black, witnesses used the term "gorilla pimp," the issue of pimping was highly relevant, and there is no evidence that the prosecutor's "'only purpose'" in referring to appellant as a "gorilla pimp" was to compare "Black human beings to primates." (*McKenzie, supra*, 21 Wash.App.2d at p. 723.)  In *McKenzie* the "factual backdrop alone presented unavoidable racial overtones" because "a Black man [was] accused of attempting to have sex with a 13-year-old white girl." (*Id*. at p. 734.)  In addition, unlike

17

the present case, in *McKenzie* "the State improperly infused the jury's assessment of whether to credit Mr. McKenzie's testimony with a dehumanizing characterization of Black men." (*Ibid*.)  Moreover, the appellate court "note[d] this appears not to be the first time the prosecutor in Mr. McKenzie's case has utilized inflammatory stereotyping, leading to reversal of a conviction."  (*Id*. at p. 733.)  Finally, although defense counsel in *Mckenzie* had not objected to the prosecutor's use of the term "gorilla pimp," the appellate court never considered whether counsel had forfeited the racial issue by failing to object or whether the failure was excused because counsel was ineffective.

Accordingly, appellant "is relegated to the remedy of habeas corpus, wherein [he] can bring forth evidence outside the record on appeal."  (*People v. Bills* (1995) 38 Cal.App.4th 953, 962.)

*Substantial Evidence Supports the Trafficking Convictions and Finding of Great Bodily Injury*

Appellant challenges the sufficiency of the evidence supporting his convictions for trafficking K.W. (count 1), B.C. (count 2), and B.W. (count 3), as well as the finding that he inflicted great bodily injury (GBI) upon B.W.  "To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or [GBI enhancement] beyond a reasonable doubt.  [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty [or the GBI enhancement true] beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.

18

[Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

<u>B.W.</u>

Because B.W. was an adult, appellant was charged with trafficking her under section 236.1, subdivision (b), which provides:  "A person who deprives or violates the personal liberty of another with the intent to effect or maintain a violation of [certain enumerated crimes, such as pimping or pandering] is guilty of human trafficking . . . ."

Appellant contends "there was no substantial evidence he deprived or violated [B.W.'s] personal liberty."  Appellant argues: "[B.W.] testified that throughout her relationship with appellant, he was abusive and he hit, beat, choked, or strangled [her] over 20 times. . . .  However, there was no evidence appellant caused a substantial and sustained restriction on [B.W.'s] liberty by such violence, force, or fear.  Instead, [B.W.] stated [she] ran off from appellant and left him about five times."  "The evidence demonstrated [B.W.] came and went as she pleased . . . during their relationship."

Section 236.1, subdivision (h)(3) defines "'[d]eprivation or violation of the personal liberty of another'" as "includ[ing] substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence,

19

duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out." (Italics added.)

Based on B.W.'s "testimony, a jury could reasonably conclude [appellant] limited [her] freedom of movement with the specific intent of pimping her. By constantly monitoring [B.W. when she was working for him], by making her financially dependent on him [by taking all of the money that she had earned], and by using . . . physical abuse to gain her compliance with his demands that she prostitute herself every day [except Thursday], the jury could conclude [appellant] trafficked [B.W.]. (See *People v. Guyton* (2018) 20 Cal.App.5th 499, 507 . . . [human trafficking conviction affirmed where, inter alia, the defendant isolated the victim, constantly monitored her, made her work when she was exhausted, and made her financially dependent on him].)" (*People v. Oliver* (2020) 54 Cal.App.5th 1084, 1099-1100.)

Appellant claims "there was no evidence appellant inflicted great bodily injury on [B.W.] *in the commission* of trafficking her." Section 236.4, subdivision (b) provides, "Any person who inflicts great bodily injury on a victim in the commission . . . of a violation of Section 236.1 shall be punished by an additional and consecutive term of imprisonment in the state prison for 5, 7, or 10 years."

Substantial evidence supports the jury's finding that appellant inflicted great bodily injury upon B.W. in the commission of trafficking her. B.W. testified that appellant had "use[d] violence upon [her] to get . . . [her] to follow his rules and his program." She further testified that appellant had inflicted the serious injury to her lip and had broken her finger while she was working for him. Appellant struck B.W. in the lip with a

20

hard brush after she had called him "either a fat ass or a fat bitch" during an argument. It is reasonable to infer that appellant delivered this blow to make clear that B.W. would be severely beaten if she did not show respect for him in his role as her pimp.

K.W.

Because K.W. was a minor, appellant was charged with trafficking her under section 236.1, subdivision (c), which provides: "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of [certain enumerated crimes, such as pandering or pimping] is guilty of human trafficking." The information further charged that, pursuant to section 236.1, subdivision (c)(2), the offense involved "force, fear, . . . or threat of injury." Appellant was convicted as charged.

Appellant asserts, "[T]here was no substantial evidence he caused, induced, or persuaded [K.W.] to engage in a commercial sex act or that he did so by using force, fear, violence, coercion, duress, or menace." But section 236.1, subdivision (c) provides that a mere attempt to cause, induce, or persuade a minor to engage in a commercial sex act is a crime if accompanied by the requisite intent.

Overwhelming evidence supports appellant's conviction. K.W. was a 14-year-old-runaway who had never worked as a prostitute. Without her consent or knowledge, she was driven to a location where sex workers congregated. Appellant, who was a passenger in the vehicle, said to K.W., "'Get out of my car, Bitch.'" Appellant and his prostitute, Trish, "dragged" K.W. out of the car and directed her to perform sex acts for customers. K.W. was

21

"scared." For two days, she did as she was told and gave all of her earnings to appellant.

Appellant's "aggression and his authority" led K.W. to believe that she was not free to leave. K.W. was particularly vulnerable because of her youth and small stature. She testified that appellant was "way bigger" and "way older" than her. She described herself as "little."

On the third day K.W. contacted a black man she knew. Appellant had told her not to contact black men. As punishment for violating his rules, appellant "socked [K.W.] in [the] mouth, busted [her] lip, and told [her to] go stand in the corner." It is reasonable to infer that appellant resorted to violence in an attempt to exert control over K.W. and force her to comply with his sex-worker rules.

Fortunately, K.W. had the good sense to flee down the stairs to the safety of the motel manager's office. K.W. described her mental state while she was fleeing: "I'm scared. I'm 14 years old. I don't want to be here no more, and [appellant] won't allow me [to] leave."

B.C.

As to B.C., appellant was also convicted of trafficking a minor by use of force, fear, or threat of injury. (§ 236.1, subd. (c)(2).) Appellant contends that, "similar to [K.W.], . . . there was no substantial evidence he caused, induced, or persuaded her [or attempted to cause, induce or persuade her] to engage in a commercial sex act by use of force, fear, violence, coercion, duress, or menace."

Here, too, the evidence of appellant's guilt is overwhelming. After appellant slapped B.C. in the face, she fled from the motel room. Appellant ran after her, "chased her with a car" "down to the blade," and brought her back to the motel room. B.C. testified that she had fled because she was "afraid" of appellant

22

and did not "want to be beaten anymore by" him.  "So [she] tried to escape by running away, and [she] got chased down the street until [she] got caught."  "[A]fter [she] got caught, [appellant] put [B.C.] back out and forced [her] to work as a sex worker."

*Substantial Evidence Supports Appellant's*
*Convictions for Kidnapping K.W. and B.C.*

"Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."  (§ 207, subd (a).)  To prove the crime of simple kidnapping in violation of section 207, subdivision (a), "the prosecution must generally 'prove three elements:  (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.' [Citation.]"  (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.)

## K.W.

As to K.W., appellant was convicted of kidnapping an unresisting child in violation of section 207, subdivision (e), which provides, "For purposes of those types of kidnapping requiring force, the amount of force required to kidnap an unresisting infant or child is the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent."  K.W.'s kidnapping was based on appellant's transportation of her to "the Harbor Track" in Orange County, where he and Trish dragged her out of the car and directed her to perform sex acts for money.

Appellant claims "there was no substantial evidence [he] took or carried [K.W.] away for an illegal purpose or with illegal intent" because he "was the passenger of the car, not the driver," and K.W. "never heard appellant give directions to the driver."

23

But the jury could have reasonably inferred that appellant had directed the driver to transport K.W. to the Harbor Track. Appellant was the beneficiary of the transportation since he, not the driver, received all of K.W.'s earnings. Moreover, appellant acknowledged ownership of the car when he said to K.W., "'Get out of my car, Bitch.'" Finally, K.W. fell asleep in the car so she would not have heard what, if anything, appellant had said to the driver.

Appellant also claims there was no substantial "evidence that [K.W.] did not consent to the movement and, in fact, her testimony was that she consented." There is no evidence that K.W. consented to being transported to a center of prostitution where she would perform sex acts for money. She testified that she "[was] supposed to go home."

B.C.

During closing argument the prosecutor said, "The kidnapping of [B.C.] occurred when [she] ran off [from the motel room] after being slapped by [appellant] . . . . He then runs out of the motel room, jumps in the car, chases [B.W.] down the Blade, recaptures her, brings her back to the motel room crying and distraught and continues to traffic her in the commercial sex trade." Appellant argues, "This evidence was insufficient to prove appellant took, held, or detained [B.C.] by using force or instilling reasonable fear, that he moved [her] a substantial distance, or that [she] did not consent to the movement."

The jury could have reasonably inferred that appellant had unlawfully used force or fear to return B.C. to the motel room, that she had not consented to the movement, and that the movement was for a substantial distance. Appellant cites no authority to the effect that the movement of B.C. from "the Blade" to the motel room was not a substantial distance. (See *People v. Delacerda* (2015) 236 Cal.App.4th 282, 295 [reasonable

24

trier of fact could find that dragging victim "for an actual distance [of] at least 22 feet and perhaps as much as 40 feet" was substantial for purposes of simple kidnapping].)

*Sentencing Issues*

<u>Count 3 – Trafficking B.W.</u>

As to count 3, appellant was convicted of trafficking B.W. (§ 236.1, subd. (b).)  The trial court sentenced him to prison for the middle term of 14 years plus the middle term of 7 years for inflicting great bodily injury upon B.W.  (§ 236.4, subd. (c).) Appellant contends the trial court erred in not imposing the lower terms of eight years for the trafficking conviction and five years for inflicting great bodily injury.

Appellant argues that the imposition of the middle terms "violates Penal Code section 1170, subdivision (b)(6)," which provides in relevant part: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was *a contributing factor in the commission of the offense*:  [¶]  (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.  [¶]  (B) The person is a youth or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense."  (Italics added.)  Section 1016.7, subdivision (b) provides, "A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed."

In the trial court defense counsel filed a sentencing memorandum in which she stated, "[Appellant] was a youth at the time of [the] offense [citation] and he also had suffered

25

sexual abuse at the hands of [B.W.] for several years." Counsel noted, "[B.W.] was . . . four years older than [appellant] when she began a sexual relationship with him when he was age 14-15." Counsel also observed that appellant had dropped out of school in the ninth grade and had "demonstrated borderline intellectual functioning, testing overall in the 4th percentile."

Counsel continued: "This sexual relationship between an adult [B.W.] and an intellectually challenged minor, a 'child' in the words of the prosecution, is at the very heart of mitigation. . . .  [Appellant] was the same age as [K.W.] when [B.W.] began raping him." Appellant's "intellectual functioning, his age and [B.W.'s sexual] abuse *could only work to contribute* to his commission of the offenses."

The trial court's "sentencing decision [is] subject to review for abuse of discretion.  [Citations.]  The trial court's sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.'" (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

The trial court did not abuse its discretion in sentencing appellant to the middle term.  At the sentencing hearing the trial court explained: "[T]he court finds no contributing factor of the relationship with [B.W.] when [appellant] was 14 to the commission of this offense.  There was no evidence that relationship involved force or violence. . . . It is a statutory rape.  It's not a serious felony . . . or a violent felony . . . .  [¶]  . . . There is no evidence [appellant] was a victim of violence.  [¶] . . . [¶]  The victims were particularly vulnerable.  There were multiple victims.  He did use violence according to the testimony.  He behaved as if he was running a business, an operation.  [¶]  There was no indication . . . of any mental insufficiency on

26

the part of [appellant].  In fact, quite the contrary.  He acted with a level of sophistication in running the business of human trafficking, trafficking human beings for sex."

<u>Counts 5 and 8 – Kidnapping B.C. and K.W.</u>

The trial court imposed sentences on both the trafficking and kidnapping convictions as to B.C. and K.W.  Appellant claims that, pursuant to section 654, the sentences must be stayed on the kidnapping convictions because they "were incident to appellant's one objective and single criminal intent of trafficking" B.C. and K.W.

Section 654, subdivision (a) provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  "'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'"  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

"'When [as here] a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective.' [Citation.]  We review for substantial evidence a trial court's implied finding that a defendant had separate intents and objectives for different offenses."  *In re L.J.* (2021) 72 Cal.App.5th 37, 43.)

Substantial evidence supports the trial court's implied finding that appellant committed the kidnappings not only for the purpose of trafficking B.C. and K.W., but for other purposes

as well.  The court could have reasonably concluded that appellant kidnapped B.C. to (1) punish her for running away, and (2) to make clear to B.W., who witnessed the incident, that his prostitutes were his property and could not gain their freedom by leaving him.

Moreover, before appellant kidnapped B.C., he had already committed the offense of trafficking her by force or fear.  B.W. testified that, prior to the slapping incident in the motel room that led to B.C.'s attempted escape and kidnapping, she had seen appellant slap B.C. on another occasion because B.C. "didn't make enough money."  B.C. "was crying."  Thus, the kidnapping of B.C. was a new offense that occurred after appellant had trafficked her.

As to K.W., the court could have reasonably concluded that appellant kidnapped her to both traffick her and have sex with her.  K.W. testified that, while she was taking a shower, appellant "busted" into the bathroom and "tried to grab" her.

In addition, as to both B.C. and K.W., multiple punishment was permissible because appellant had time to reflect between the kidnappings and his subsequent trafficking of them.  In *People v. Surdi* (1995) 35 Cal.App.4th 685, the defendant complained that, in violation of section 654, he had been punished for both kidnapping and mayhem.  The defendant argued that "the kidnapping was for the sole purpose of beating" the victim.  (*Surdi, supra,* at p. 688.)  The appellate court held that multiple punishment was permissible because the assaults against the victim "did not arise from a single volitional act.  Rather, they were separated by considerable periods of time during which reflection was possible."  (*Id*. at p. 689.)  Like the defendant in *Surdi*, appellant had time to reflect between his kidnapping of K.W. on day one and his insistence that she perform sex work on days two and three.  He also had time to

28

reflect between his kidnapping of B.C. and his insistence on the following days that she continue to perform sex work for him.

*Disposition*

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.


YEGAN, J.


I concur:


GILBERT, P. J.

CODY, J., Concurring and Dissenting:

I concur in the majority opinion except for its discussion regarding the Racial Justice Act (RJA, Pen. Code[1], § 745) and its affirmance of the judgment, from which I respectfully dissent. By gratuitously describing appellant as a "gorilla pimp" during closing argument, the prosecutor violated the RJA. No satisfactory explanation exists for failing to object to such a clear violation.

On appeal, the People concede appellant was deprived of his right to effective assistance of counsel. We reversed a judgment under similar circumstances in *People v. Simmons* (2023) 96 Cal.App.5th 323, 336 (*Simmons*). Now, the majority rejects the People's concession, finds the RJA claim forfeited, and affirms. I see no reason to depart from *Simmons*. As there, no reasonable tactic or strategy justified counsel's inaction. I would reverse the judgment and remand for further proceedings consistent with the RJA.

*The People's Closing Argument*

The prosecutor first used the term "gorilla pimp" during closing argument to explain why 14-year-old K.W. feared appellant: "The fact that [K.W.] is staring at a 5'11", 200 some odd pounds gorilla pimp in the face, she is in a strange environment, she doesn't know how to get herself out of it, that is enough to make any child fearful." The prosecutor used the term a second time when arguing the defense would engage in victim blaming: "They want to have you look down your noses and demonize and vilify these victims who are, no fault of their own, being trafficked by a gorilla pimp." The third use had a similar tone: "So the defense in their questioning of [K.W.], weren't you hanging out with this girl named Mohogany? We know that the girls that just have one name, that have a little sexiness to it, Mahogany, that's got to be a sex worker as if hanging out with a

---

[1] Undesignated statutory references are to the Penal Code.

1

sex worker makes [K.W.] fair game for being trafficked by a gorilla pimp or any pimp or any individual. It doesn't." Defense counsel did not object.

*The RJA*

The RJA prohibits criminal convictions obtained "on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) The RJA is violated when, "[d]uring the defendant's trial, in court and during the proceedings, . . . an attorney in the case . . . use[s] racially discriminatory language about the defendant's race, ethnicity, or national origin, . . . whether or not purposeful." (*Id.*, subd. (a)(2).) "'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to . . . language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (*Id.*, subd. (h)(4).)

*The Prosecutor's Closing Argument Violated the RJA*

There is no dispute pimps, traffickers, and sex workers use the term "gorilla pimp" in their trade. When and how it should be used in the courtroom are separate issues. The RJA accommodates the use of racially laden language "if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the subject." (§ 745, subd. (a)(2).) The prosecutor did not use the term for these purposes.

First, the prosecutor was not "relating language used by another that is relevant to the case . . . ." (§ 745, subd. (a)(2).) The prosecutor introduced jurors to the term "gorilla pimp" during the People's opening statement. None of the victims volunteered the term when testifying. The investigating detective did describe a "gorilla pimp" as one "who uses very aggressive tactics." But the prosecutor's triplicate use of the term in closing argument did not simply relate another's language.

2

Rather, the prosecutor herself adopted and deployed the term in an effort to persuade the jury.

Second, the prosecutor's use of the term cannot be characterized as "giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2).) The prosecutor could discuss appellant's stature and conduct without resorting to gratuitous interjections of street slang. Doing so appealed to racial bias because it "tap[ped] into deep-seated racial prejudice . . . comparing Black human beings to primates." (*State v. McKenzie* (Wash. Ct. App. 2022) 21 Wn.App.2d 722, 723 (*McKenzie*); *Bennett v. Stirling* (4th Cir. 2016) 842 F.3d 319, 324-325 [use of similar terms "mined a vein of historical prejudice" against those "who have been appallingly disparaged as primates or members of a subhuman species in some lesser state of evolution"].) Given this historical context, the prosecutor's use of "gorilla pimp" to describe appellant violated the prohibition against racially discriminatory language "about the defendant's race, ethnicity, or national origin . . . ." (§ 745, subd. (a)(2).)

"[T]here is no need or excuse for professionals such as law enforcement or prosecutors to perpetuate the harmful simianization of Black men by using the term 'gorilla pimp.'" (*McKenzie*, *supra*, 21 Wn.App.2d, at p. 732.) The majority notes that "[a]t no time did the prosecutor compare appellant to an actual gorilla" (Maj. Opn., p. 3.), as if the addition of the word "pimp" after "gorilla" somehow ameliorates the harm rather than exacerbating it. As the Legislature has determined: "Because use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system." (Stats. 2020, ch. 317, § 2, subd. (e).) One strains to produce an example of animal imagery more inflammatory than "gorilla pimp." Its repeated, unabashed use during the prosecutor's closing argument violated the RJA.

3

*Forfeiture and Ineffective Assistance of Counsel*

Rather than directly confronting the RJA claim on the merits, the majority determines appellant forfeited it. The majority concludes appellant is "limited to his claim that counsel was ineffective." (Maj. Opn., p. 3.) The People concede defense counsel deprived appellant of effective assistance by failing to object. I would accept this concession.

"To prevail on an ineffective assistance of counsel claim, appellant must satisfy the test established in *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674]. 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant [under] the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citations.] To satisfy the first part of the test, appellant must demonstrate that 'counsel's representation fell below an objective standard of reasonableness.' [Citation.] To satisfy the second, appellant 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Simmons*, *supra*, 96 Cal.App.5th at p. 336.)

"'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.'" (*People v. Carrasco* (2014) 59 Cal.4th 924, 985.) We are met with the rare case. The majority posits various reasons why counsel might have decided not to object. I believe the prosecutor clearly violated the RJA, which eliminates the possibility defense counsel reasonably determined an objection would be futile. Once an RJA violation has been established, "the trial court is

4

required to 'impose a remedy specific to the violation' from the list of remedies provided.  (§ 745, subd. (e).)  Imposing any one of the enumerated remedies would have changed the result of the proceeding." (*Simmons*, *supra*, 96 Cal.App.5th at p. 337.)  Given the available remedies and the violation's unequivocal nature, there is a reasonable probability—indeed, a strong likelihood— the proceeding's result would have been different had defense counsel objected.  Appellant has demonstrated ineffective assistance of counsel.

*Appellant's Remedy Is Reversing Judgment*

As this division noted just 20 months ago, the RJA "forecloses any traditional case-specific harmless error analysis." (*Simmons*, *supra*, 96 Cal.App.5th at p. 337.)  "The plain language of the statute . . . mandates that a remedy be imposed without requiring a show of prejudice." (*Ibid*.)  As in *Simmons*, I would reverse the judgment and remand for further proceedings.  (*Id*., at p. 339.)  This result would be consistent with the Legislature's conclusion that "racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California."  (Stats. 2020, ch. 317, § 2, subd. (i).)

CERTIFIED FOR PUBLICATION

CODY, J.

5

Richard M. Goul, Judge
Superior Court County of Los Angeles

_____

Law Offices of Christine M. Aros and Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, and Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.